NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Merrimack
No. 2016-0696


VENTION MEDICAL ADVANCED COMPONENTS, INC. D/B/A ADVANCED POLYMERS, A VENTION MEDICAL COMPANY

v.

NIKOLAOS D. PAPPAS & a.

Argued: October 25, 2017
Opinion Issued: June 8, 2018


Welts, White & Fontaine, P.C., of Nashua (Jack S. White on the brief), and Cook, Little, Rosenblatt & Manson, PLLC, of Manchester (Arnold Rosenblatt and Kathleen Mahan on the brief, and Mr. Rosenblatt orally), for the plaintiff.

Devine, Millimet & Branch, Professional Association, of Manchester (Steven E. Grill on the brief and orally), for the defendants.

LYNN, C.J. The defendants, Nikolaos D. Pappas (Pappas) and Ascend Medical, Inc. (Ascend), appeal multiple orders of the Superior Court (McNamara, J.) ruling that they misappropriated trade secrets of the plaintiff, Vention Medical Advanced Components, Inc. d/b/a Advanced Polymers, a Vention Medical Company (Vention), in violation of the New Hampshire Uniform Trade Secrets Act, RSA chapter 350-B (2009) (UTSA). Vention cross-appeals the trial court's denial of its request for attorney's fees. We affirm.

The pertinent facts follow. Vention is a medical components manufacturer in the medical device industry. Vention makes medical balloons, medical tubing, and heat shrink tubing (HST). Vention's current chief technology officer, Mark Saab, co-founded the company Advanced Polymers in 1989. KRG Capital Management (KRG), a majority shareholder of Vention, acquired Advanced Polymers in 2010 for a substantial purchase price. A KRG officer testified that, at that time, a core consideration of KRG's decision to purchase Advanced Polymers was its belief that the company's "proprietary [HST] capabilities offer high margin component business with significant trade secret protection." (Quotation omitted.) After the acquisition, Advanced Polymers became part of Vention, which conducted a financial analysis and attributed more than a third of the purchase price to the value of Advanced Polymers' unpatented technology.

Pappas began working at Vention after he graduated from the University of Massachusetts Lowell with a bachelor of science degree in plastics engineering and a master's degree in innovative and technological entrepreneurship. Prior to working at Vention, Pappas had neither specifically studied HST nor had any experience working with HST. In December 2013, after working for Vention for about ten years, Pappas resigned from the company.

During his employment, Pappas signed an "Employee Invention Assignment and Confidentiality Agreement" (confidentiality agreement). The confidentiality agreement provides:

> At all times, both during my employment and after its termination, I will keep and hold all such Proprietary Information in strict confidence and trust, and I will not use or disclose any of such Proprietary Information without the prior written consent of the Company, except as may be necessary to perform my duties as an employee of the Company.

The confidentiality agreement defined proprietary information to mean "information of a confidential or secret nature," including but not limited to "Inventions, Intellectual Property Rights, Moral Rights, marketing plans, product plans, business strategies, financial information, forecasts, personnel information and customer lists."

During his employment, Pappas was exposed to Vention's confidential HST technology and information. He also had knowledge of Vention's business and marketing information and strategies, including the sales volumes for Vention's various products. At the time he resigned, he was serving as the engineering manager of the HST department. At some point before Pappas

resigned, he consulted with an attorney about his obligations under the confidentiality agreement.

Almost immediately after leaving Vention, Pappas established Ascend. In late December 2013 and January 2014, the defendants began working with a website developer, communicated with one equipment vendor, and provided an initial machine design to a second equipment vendor. This design included extensive detail and critical specifications of the equipment they wanted built. By August 2014, the defendants began actively marketing HST. After the defendants launched their HST line, Vention requested information about the products. The defendants sent Vention samples of their HST in August and September 2014.

Vention petitioned the trial court for injunctive and other relief under the UTSA in October 2014. On November 4, 2014, counsel for the defendants filed appearances, in which they requested a jury trial. On November 14, 2014, the defendants filed an answer, but they did not request a jury trial in the answer. See Super. Ct. Civ. R. 9(c) (requiring a defendant to request a jury trial in his or her answer to preserve the right to a jury trial). The defendants included several paragraphs in their answer under the heading "counterclaims."

Subsequently, on January 7, 2015, the defendants filed a motion to amend their answer. In the motion, the defendants asserted that the original answer "contains a single counterclaim for unfair business practices, based on the New Hampshire Consumer Protection Act, RSA [chapter] 358-A." The defendants further asserted that they "wish to amend the counterclaim by adding allegations of additional conduct which they believe support the unfair trade practices counterclaim" and that "because some of the conduct alleged, if proven, would amount to defamation, they also wish to add a cause of action for defamation." The defendants also sought to "add a jury demand to the pleading."

After a four-day hearing conducted between November and December, the trial court granted a preliminary injunction in January 2015 that, among other relief, enjoined the defendants from "directly or indirectly designing, manufacturing, producing and/or selling" certain HST products. In February 2016, the trial court issued another order, ruling that the defendants had waived their right to a jury trial by failing to assert it in their answer and ordered that the case proceed by bench trial.

During discovery, Vention filed a trade secret disclosure and an amended "Trade Secret/Confidential Information Disclosure" with the trial court. Sometime thereafter, Vention moved to compel responses to certain interrogatories and production requests from the defendants. The defendants objected, arguing that they should not be required to provide discovery until Vention produced an adequate description of its trade secrets, and they moved

3

to compel an adequate trade secret designation and responses to interrogatories that would require Vention to specify its trade secrets. The trial court denied the defendants' motion to compel and granted Vention's motion to compel, ruling that Vention had adequately disclosed its trade secrets.

The trial court held an eight-day bench trial in June 2016. During the trial, Vention presented expert testimony from Dr. Chris Rauwendaal, who had worked for 43 years in plastics extrusion. Rauwendaal testified that the technology Vention used to create HST was proprietary, as were a number of features in Vention's process for making HST. Rauwendaal testified that these features were all trade secrets, and that the defendants' process for making HST utilized all of these features. Rauwendaal further testified that Vention's process for making HST was distinguishable from several other industry and competitor processes. Additionally, Rauwendaal reviewed the defendants' design and experimentation records and concluded that they could not have duplicated Vention's technology without copying it, based upon the timeframe in question and the lack of documentation of experimentation.

Vention also presented expert testimony from Dr. Amad Tayebi, a retired professor in mechanical and plastics engineering. Tayebi testified regarding a certain part of Vention's equipment, which he concluded was a trade secret. He testified that he had never seen a design like that used by Vention, and he identified four specific component features of the part. He testified that Vention designed and fabricated each of these components and that the components were not available on the open market. Tayebi compared Vention's part to a part that the defendant used, and he opined that the two parts were "substantially identical." Tayebi distinguished Vention's part from those used by three other companies. Additionally, Tayebi reviewed the defendants' design and experimentation records and concluded that the defendants could not have duplicated Vention's part without copying it, based upon the timeframe in question and the lack of documentation of experimentation.

In September 2016, the trial court issued an order ruling that the defendants had misappropriated Vention's trade secret technology for producing certain HST. The trial court further ruled that Vention was entitled to equitable relief on its breach of contract claim, but it denied Vention's request for attorney's fees. The trial court ruled that the defendants were not entitled to judgment on their counterclaims for violation of RSA chapter 358-A and business disparagement.

The trial court issued five injunctions against the defendants:

1. The Defendants are hereby permanently enjoined and restrained from directly or indirectly disclosing or utilizing in any way any confidential or proprietary information, trade secrets,

designs, inventions, intellectual property, and moral rights or processes of the Plaintiff.

2.  The Defendants are hereby permanently enjoined and restrained from directly or indirectly designing, manufacturing, producing, selling, or consulting on polyester heat shrink tubing with a [specified] wall thickness . . . ;

3.  The Defendants are hereby enjoined and restrained for ten years from directly or indirectly designing, manufacturing, producing, selling, or consulting on heat shrink tubing made with materials other than polyester with a [specified] wall thickness . . . ;

4.  The Defendants are hereby permanently enjoined from directly or indirectly designing, manufacturing, producing, selling, or consulting on [the part that Tayebi testified was trade secret] or . . . [a] substantially similar [part] . . . ;

5.  The Defendants are ordered to destroy all their equipment, designs, and testing within 30 days of this Court's order and provide certification of such destruction . . . .

(Footnote omitted.)

Vention filed a motion for reconsideration of the trial court's denial of its request for attorney's fees, which the trial court denied. The defendants did not file a motion for reconsideration. This appeal followed.

On appeal, the defendants argue that: (1) the trial court erred in denying the defendants' request for a jury trial; (2) the trial court erred as a matter of law in failing to require Vention to specify its trade secrets prior to discovery; (3) the trial court erroneously shifted Vention's burden of proof at trial to the defendants; (4) the trial court's finding that the defendants did not misappropriate certain specified Vention technology was fatal to Vention's case; (5) certain admissions of Vention's trial witnesses were fatal to Vention's case; and (6) the trial court's injunctions were not supported by specific findings, were overbroad, and were not tailored to remedy the alleged harm. We will address each argument in turn.

II

The defendants argue that the trial court erred in denying their request for a jury trial. The right to a jury trial is guaranteed by the New Hampshire Constitution. See N.H. CONST. pt. I, art. 20. "To preserve the right to a jury trial, a defendant entitled to a trial by jury must indicate his or her request for

5

a jury trial upon the first page of the Answer at the time of filing." Super. Ct. Civ. R. 9(c). "Failure to request a jury trial in accordance with this rule shall constitute a waiver by the defendant thereof." Id. "The trial court has broad discretion in determining whether to waive its rules, and we will not reverse its decision absent an unsustainable exercise of discretion." Anna H. Cardone Revocable Trust v. Cardone, 160 N.H. 521, 525 (2010).

The defendants acknowledge that they did not comply with Rule 9(c) by asserting their right to a jury trial in the answer that they filed in November 2014. However, they argue that the trial court had the discretion to waive the application of Rule 9(c). See Super. Ct. Civ. R. 1(d) ("As good cause appears and as justice may require, the court may waive the application of any rule."). The defendants argue that the trial court unsustainably exercised its discretion by denying their request because they indicated at the beginning of the case, albeit in improper form, that they wanted a jury trial, and the case was still at a very early stage when they recognized the error and requested to cure it. They further argue that "Vention did not demonstrate that any prejudice or harm would result from granting the request [for] a jury trial." According to the defendants, "these facts simply cannot be construed as an intentional waiver of the right to a jury."

The defendants failed to demand a jury trial in their answer. Rule 9(c) is clear that such a failure constitutes a waiver of the right to a jury trial. The trial court considered and ultimately denied the defendants' request that it allow for a late assertion of a jury trial. In making its ruling, the trial court reasoned that the trial would involve "many confidential documents" and that "the difficulties in ensuring that the jury be given access to relevant documents but that those documents do not fall into the public domain will undoubtedly lengthen the trial." See Super. Ct. Civ. R. 1(b) ("The rules shall be . . . administered to secure the just, speedy, and cost-effective determination of every action.").

Considering all the circumstances, as well as the defendants' request to deviate from the clear terms of Rule 9(c), we cannot say that the trial court committed an unsustainable exercise of discretion when it decided not to grant relief from the rule under these circumstances.

The defendants alternatively argue that, even if they did waive their right to a jury in their original answer, they did not waive their right to a jury for the "entirely new claim for defamation" that they included in their amended answer. The defendants contend that, because they were entitled to a jury on this counterclaim, it was an unsustainable exercise of discretion for the trial court not to allow a jury trial on all counts.

We have previously stated that waiver of the right to a jury trial "extends only to the issues then formed at the time of waiver and does not apply to new

and different issues that may thereafter be raised under amended pleadings." Lucas v. Cate, 99 N.H. 134, 135 (1954). The defendants' motion to amend their answer did purport to add a new cause of action and demanded a jury trial. In the motion, the defendants stated: "In addition, because some of the conduct alleged [in the motion], if proven, would amount to defamation, they also wish to add a cause of action for defamation. Finally, they seek to add a jury demand to the pleading." The trial court, however, rejected the defendants' argument that the defamation counterclaim was new because "the [c]ounterclaim for defamation was contained in the original answer."

We agree with the trial court that this was not a new claim for defamation. In the defendants' original answer, they described communications from Vention's agents to the defendants' landlord and sales representatives in Europe, and then they alleged as follows:

> 187. As described above, Vention, through its agents, Mr. Saab and/or Ms. Albert, has intentionally and without reasonable care, communicated false and misleading statements to third parties about the scope and enforceability of Mr. Pappas' covenants, and has also intentionally made false and misleading statements to third parties to impugn Mr. Pappas' character and to irreparably harm his professional reputation. The third parties understood the defamatory meaning [of] Vention's statements, and Vention had no valid privilege for making such false and defamatory statements about Mr. Pappas. Vention's conduct in this regard constitutes defamation, for which Mr. Pappas has and continues to suffer damages, including consequential damages, harm to his reputation and loss of business, all within the jurisdictional limits of this Court.

This is a claim for defamation. See Pierson v. Hubbard, 147 N.H. 760, 763 (2002) ("A plaintiff proves defamation by showing that the defendant failed to exercise reasonable care in publishing a false and defamatory statement of fact about the plaintiff to a third party, assuming no valid privilege applies to the communication."). Nor are we persuaded by the defendants' reliance on the fact that, in their amended answer, they described additional communications from Vention to "other business associates of Mr. Pappas and Ascend." The defendants cannot withdraw their waiver simply by alleging additional facts to support an existing claim for defamation. This is not a "new and different issue[]." Lucas, 99 N.H. at 135. Accordingly, we reject the defendants' argument that the trial court erred by denying their request for a jury trial on this issue.

III

The defendants next argue that the "trial court erred as a matter of law in failing to require Vention to specify its trade secrets prior to discovery."

7

Vention counters that the trial court correctly ruled that Vention had disclosed its trade secrets with "reasonable particularity."

Before turning to the merits of the defendants' argument, we must determine the appropriate standard of review. The defendants argue that we should review de novo the trial court's determination that Vention carried its burden of disclosing its claimed trade secrets with reasonable particularity before discovery. According to the defendants, this issue is a question of law. Vention disagrees, arguing that because the defendants are appealing the trial court's rulings on motions to compel, we should apply our unsustainable exercise of discretion standard. According to Vention, this is a discovery issue, which is a matter within the sound discretion of the trial court.

We agree with Vention that the trial court's determination that Vention had adequately specified its trade secrets such that the parties could move to discovery was ultimately a determination regarding discovery. See Vesta Corp. v. Amdocs Management Ltd., 147 F. Supp. 3d 1147, 1155 (D. Or. 2015) (stating that "whether a plaintiff has sufficiently disclosed its trade secrets is a fact-specific question to be decided on a case-by-case basis" (quotation omitted)); State v. Brown, 154 N.H. 345, 349 (2006) (noting that we "review the trial court's fact-specific determinations for an unsustainable exercise of discretion"). Such a determination is appropriately left to the trial court. See Miller v. Basbas, 131 N.H. 332, 338 (1988) (observing that "control over the breadth and scope of pre-trial discovery is left to the sound discretion of the trial judge"). "We review a trial court's rulings on the management of discovery under an unsustainable exercise of discretion standard." N.H. Ball Bearings v. Jackson, 158 N.H. 421, 429 (2009).

Nevertheless, the defendants maintain that this issue is a substantive issue, rather than a discovery issue. The defendants cite numerous cases in which courts dismissed trade secret claims for failure to adequately identify the alleged secrets. See, e.g., Beane v. Beane, 856 F. Supp. 2d 280, 285, 305 (D.N.H. 2012). However, the cases that the defendants rely upon involved rulings on the merits. See, e.g., id. at 314. Accordingly, they provide no support for the defendants' argument, and we will review the trial court's ruling on the adequacy of Vention's pre-discovery trade secret disclosure using our unsustainable exercise of discretion standard.

The trial court, relying on several federal cases, ruled that parties claiming misappropriation of trade secrets are required to disclose their trade secrets at the outset of discovery. The trial court identified several policy considerations that support requiring such a disclosure: (1) it promotes investigating trade secret claims prior to suit and discourages filing meritless claims; (2) it prevents plaintiffs from using the discovery process to obtain the defendant's trade secrets; (3) it frames the appropriate scope of discovery; and (4) it enables the defendant to form complete and well-reasoned defenses. See

8

DelPhon Indus., LLC v. Int'l Test Solutions, Inc., No. C 11-01338 PSG, 2012 U.S. Dist. LEXIS 659, at *8-9 (N.D. Cal. Jan. 4, 2012); see also DeRubeis v. Witten Technologies, Inc., 244 F.R.D. 676, 681 (N.D. Ga. 2007) (reasoning that "requiring the plaintiff to state its claimed trade secrets prior to engaging in discovery ensures that it will not mold its cause of action around the discovery it receives"). The trial court also identified competing considerations: (1) plaintiffs have a broad right to discovery; and (2) a trade secret plaintiff may have no way of knowing what trade secrets have been misappropriated until it receives discovery on how the defendant is operating. See DeRubeis, 244 F.R.D. at 680.

The trial court acknowledged that these competing policies can make resolving this type of dispute difficult, and it concluded that the proper approach is fact dependent. See id. at 681. The trial court then ruled that a plaintiff must disclose its trade secrets with "reasonable particularity," which it defined as "a description of trade secrets that is sufficient to put the defendant on notice of the claims against him, and that allows a defendant to discern the relevancy of any requested discovery." (Quotation omitted.)[1]

After determining which standard it would apply, the trial court ruled that Vention's trade secret disclosure sufficiently described Vention's claimed secrets with reasonable particularity. Vention identified its claimed trade secrets as the process and equipment that it uses to make HST. In making this ruling, the trial court noted the detailed specifications that Vention provided for the individual steps of its process and cited specific examples.

The defendants argue that Vention's disclosure was insufficient because it: (1) impermissibly shifted the burden to the defendants to ascertain Vention's trade secrets from the 55-page disclosure and over 100,000 pages of incorporated documents; (2) impermissibly hedged by stating only ranges of processing parameters; and (3) did not distinguish between confidential information and trade secret information.

Vention counters that its trade secret disclosure described its trade secret technology in "step-by-step detail," including component process parameters, and "reference[d] specific documents further describing these processes." Vention further identified the critical equipment that it designed and used in this process. Vention argues that it gave ranges of parameters and specifications because its claimed trade secrets are the processes and technology it uses to make HST, not a single product, material, or tube size.

---

[1] Although no part of the UTSA explicitly requires a trade secret plaintiff to describe its trade secret in a trade secret disclosure prior to discovery, the parties do not challenge the trial court's ruling that Vention was required to disclose its trade secrets with reasonable particularity prior to discovery. Accordingly, we assume for the purposes of this appeal that such a requirement exists under New Hampshire law.

Based upon our review of the trade secret disclosure, we find that the trial court sustainably exercised its discretion in ruling that Vention had adequately specified its alleged trade secrets prior to discovery. Vention's disclosure described each step of Vention's alleged trade secret process and referenced documents that contained more specific information. In particular, the disclosures described in detail the discrete steps in the manufacturing process, equipment and technology used, raw materials used, and design parameters of end products.

To the extent that the disclosures contained ranges of processing parameters or qualifying language, we also find no error. As discussed above, Vention only needed to identify its trade secrets with "reasonable particularity," sufficient to put the defendants on notice of the claims against them and allow them to discern the relevancy of any requested discovery. The disclosures were sufficiently specific that the defendants could discern what information Vention claimed was trade secret and the relevancy of requested discovery, particularly considering that Pappas, as the former engineering manager at Vention, was familiar with Vention's technology for making HST. Moreover, we note that these disclosures did not need to prove the existence of trade secrets. That was Vention's ultimate burden at trial, not its burden for proceeding with discovery.

Finally, the defendants argue that Vention's disclosures were insufficient as a matter of law because they did not distinguish between confidential information and trade secret information. In support of their argument, the defendants rely upon Big Vision Private v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d 224 (S.D.N.Y. 2014). See Big Vision Private, 1 F. Supp. 3d at 262 (noting that the plaintiff erroneously used the terms "trade secret" and "confidential" as if they were interchangeable (quotations omitted)). However, the court in that case ruled on summary judgment that the plaintiff's trade secret was too vague and indefinite to deserve protection. See id. at 257-66. Accordingly, it provides no support for the defendants' argument that a pre-discovery trade secret disclosure that does not specifically distinguish between confidential information and trade secret information is insufficient as a matter of law.

IV

The defendants next argue that the trial court "failed to require Vention to specify at trial exactly what it claimed as a secret and accepted conclusory and superficial testimony as to essentially every element of Vention's claim." The defendants argue that this failure "improperly allocated the burden of proof," constituting reversible error. In particular, the defendants challenge the sufficiency of Vention's evidence, arguing that Vention failed to: (1) specifically identify its trade secrets and show that they were unique; (2) show that the identified information was neither general knowledge in the trade nor special

10

knowledge of those skilled in the trade; and (3) show an absence of publicly available information.

Vention first contends that the defendants did not preserve these arguments because they did not move for a directed verdict challenging the sufficiency of Vention's evidence and did not move for reconsideration on these grounds or on the grounds of the alleged burden shifting.

"This court has consistently held that we will not consider issues raised on appeal that were not presented in the lower court." LaMontagne Builders v. Bowman Brook Purchase Group, 150 N.H. 270, 274 (2003) (quotation omitted). "This principle applies to legal issues that arise after trial as a result of the court's order." Id. "This requirement is designed to discourage parties unhappy with the trial result to comb the record, endeavoring to find some alleged error never addressed by the trial judge that could be used to set aside the verdict." Id. (quotation omitted). To satisfy this preservation requirement, any issues which could not have been presented to the trial court prior to its decision must be presented to it in a motion for reconsideration. See id.; N.H. Dep't of Corrections v. Butland, 147 N.H. 676, 679 (2002).

The defendants argue that they satisfied the preservation requirement with respect to their argument that the trial court improperly shifted some of Vention's trial burden to the defendants by stating in their opening memo and their post-trial brief that Vention carried the burden of proof on these issues. We disagree. The trial court stated in its order that the "claimant must establish" the elements of trade secret misappropriation and found that Vention satisfied these elements. Thus, the trial court agreed with the defendants that it was Vention's burden to prove trade secret misappropriation. If, in making its ruling, the trial court improperly shifted some of Vention's burden to the defendants, this was a new error. Because the defendants did not bring this issue to the attention of the trial court in a motion to reconsider, the trial court had no opportunity to address it, and it is not preserved for our review.

The defendants argue that they satisfied the preservation requirement of their sufficiency of the evidence challenges by filing a post-trial brief arguing that Vention had failed to meet its burden of proof on its causes of action. We agree. The defendants presented their arguments to the trial court that Vention failed to carry its burden to prove that its trade secrets were unique and that the defendants' process for making HST was not based upon publicly available information or Pappas's industry knowledge and experience. By ruling that Vention had carried its burden of proof to show misappropriation, the trial court implicitly rejected each of the defendants' arguments regarding insufficient evidence. Because the trial court addressed these arguments, the defendants were not required to raise them in a motion for reconsideration, and the arguments are preserved for our review.

11

We now turn to the merits of the defendants' argument that the evidence was insufficient to support the trial court's ruling that Vention proved it held trade secret information. When a trial court renders a decision after a trial on the merits, we uphold its factual findings and rulings unless they lack evidentiary support or are legally erroneous. See Jesurum v. WBTSCC Ltd. P'ship, 169 N.H. 469, 476 (2016). "Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence." Id. (quotation omitted); see also Appeal of Pennichuck Water Works, 160 N.H. 18, 41 (2010) (stating that trier of fact was free to "accept or reject such portions of the evidence as it found proper, including that of expert witnesses"). We review the trial court's application of the law to the facts de novo. Jesurum, 169 N.H. at 476; see also United States v. 15 Bosworth Street, 236 F.3d 50, 53 (1st Cir. 2001) (stating that determinations about the sufficiency of evidence is a legal determination that engenders de novo review).

The UTSA defines "[t]rade secret" to mean: "information, including a formula, pattern, compilation, program, device, method, technique, or process" that "(a) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and "(b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." RSA 350-B:1, IV.

The defendants first argue that Vention failed to carry its burden of specifically identifying a trade secret and proving that it was unique. They argue that Saab testified broadly about Vention's trade secrets, but failed to identify any specific process, which is insufficient as a matter of law. They argue that Rauwendaal's testimony "was far short of the proof required in a trade secret case" because he "had no basis to opine as to whether there was anything unique about Vention's . . . technology." According to the defendants, neither Rauwendaal nor any other Vention witness ever offered evidence establishing how Vention's technology was unique as compared to the technology used by similar companies. The defendants further argue that Tayebi "lacked any basis to opine that Vention's [part] was unique" because he "only briefly examined [certain equipment used by other companies] . . . [that] Vention asked him to examine and did not evaluate other available [equipment] in the market."

The trial court determined that Vention identified trade secrets: the process and equipment that it uses to manufacture its medical HST. In making that determination, the trial court relied upon the testimony of Rauwendaal, which the court found to be credible. Rauwendaal testified that he had never encountered any other company using Vention's technology to manufacture medical HST with the same characteristics. Rauwendaal testified that several specific processes that Vention uses to make HST were trade

12

secrets. He further testified that the processes that Vention uses were not the same as other industry HST processes. The trial court also relied upon the testimony of Tayebi. Tayebi testified that a specific part that Vention uses to make its HST is a trade secret. He also testified that he had never seen another design with the features of Vention's part, and explained why the equipment of three other companies was different and not functional equivalents of the Vention part.

The trial court found that Vention derives an "economic, competitive advantage" because its HST process and equipment allow it to "serve a niche market in which it is the only company capable of manufacturing such products with the degree of enhanced characteristics." The trial court credited evidence that KRG purchased Advanced Polymers for a substantial purchase price because the company was the "market leader in heat shrink tubing and complex medical balloons that had incredibly high profit margins that KRG believed were sustainable for many, many years" and because KRG believed the purchase price reflected trade secret protection for Vention's medical balloons and HST. (Quotation and brackets omitted.)

In sum, there was evidence before the trial court that Vention held a niche market position with a competitive advantage due to its use of certain technology to make medical HST. Vention's experts identified specific aspects of the company's technology, testified that the technology was trade secret and was unique to Vention, and distinguished the technology of a number of other companies and industries. Based upon our review of the record, we cannot say that these findings of fact were legally erroneous. The trial court, as the trier of fact, could properly credit this evidence, see Pennichuck Water Works, 160 N.H. at 41, which supports the trial court's ultimate ruling that Vention carried its burden of proving that it possessed unique trade secret information.

The defendants next argue that Vention "never even attempted to meet [its] burden" of distinguishing its alleged secrets from the "enhanced skill, scientific knowledge and inventive faculties" that Pappas acquired while working for Vention. (Quotation and ellipsis omitted.) They further argue that "[t]he trial court even accepted Vention's argument that [the defendants were] obligated to show that [they] had independently developed [their] product." Vention counters that the "evidence at trial conclusively demonstrated that Vention's trade secrets were neither generally known nor readily ascertainable."

The trial court found that Rauwendaal "credibly testified" that the processes that Vention and the defendants used to make HST were "virtually identical." The trial court also relied on Rauwendaal's testimony that "no company had been able to develop technology similar to Vention's over the past 26 to 27 years" and that, to duplicate Vention's technology, "it would take a team of people" a "period of four to five years." Rauwendaal concluded that the defendants could not have duplicated Vention's technology without copying it

13

because of the defendants' lack of documented experimentation, lack of prototypes, and the timeframe in which the defendants were able to produce HST. Tayebi drew a similar conclusion regarding the defendants' design of a part that they used in their HST machine.

From this evidence, the trial court could properly conclude that the defendants did not develop their HST using enhanced skill, scientific knowledge, and inventive faculties regarding HST; rather, they developed their HST by misappropriating Vention's trade secret HST technology. Moreover, the record does not support the defendants' argument that the trial court "obligated" the defendants to show that they independently developed their product. The trial court relied upon Rauwendaal's and Tayebi's testimony, which supported Vention's burden of proving that the defendants misappropriated, rather than independently developed, Vention's trade secret HST technology. Although the defendants argue that this evidence was contradicted by Pappas's "uncontroverted" testimony that he "conducted many experiments which he did not record" and had "independently developed his machine and process parameters," the trial court did not need to accept this testimony. See In the Matter of Geraghty & Geraghty, 169 N.H. 404, 416 (2016) (noting that the trial court may reject the testimony of any witness and is "not required to believe even uncontroverted evidence" (quotation omitted)).

Finally, the defendants argue that Vention "failed to demonstrate that its allegedly secret information was different from information in the public domain." According to the defendants, "[t]here was substantial and essentially undisputed evidence regarding the widespread availability of information about similar technologies."

The defendants' argument that Vention could have done more to prove that its technology is not publicly available is unavailing. Vention produced expert testimony that its HST technology is not information that is in the public domain. Rauwendaal, in particular, opined that information from the companies identified by the defendants explained none of the choices that the defendants made when designing their machine. The defendants cross-examined Vention's experts regarding these conclusions. The trial court weighed this evidence and determined that Vention had met its burden. Because there was expert testimony, which the trial court could properly credit, that supported the trial court's conclusion that Vention proved its information was different from information in the public domain, we uphold the trial court's determination.

V

The defendants next argue that the trial court's "finding that [other specified Vention technology] was not misappropriated was fatal to Vention's case." According to the defendants, this other technology "was the foundation

14

for Vention's entire case." (Quotation omitted.) Vention argues that this argument is not preserved because the defendants did not raise it in a motion for reconsideration. We agree with Vention that this argument is not preserved.

The defendants' argument is essentially that this other finding contradicted the rest of the trial court's order, which found that the defendants misappropriated Vention's trade secret HST technology. Even assuming that a contradiction exists, the defendants never argued in a motion to reconsider that this contradiction in the trial court's order should preclude relief on Vention's entire misappropriation claim. The purported error did not exist until the trial court issued its order, and "any issues that could not have been presented to the trial court before its decision must be presented to it in a motion for reconsideration." State v. Mouser, 168 N.H. 19, 27 (2015). Accordingly, because this issue was not raised before the trial court in a motion for reconsideration, it is not preserved for our review. See Butland, 147 N.H. at 679.

VI

The defendants next argue that certain admissions of Vention's trial witnesses were fatal to Vention's case. We decline to address this issue, however, because the defendants raised it for the first time on appeal in their reply brief. See Panas v. Harakis & K-Mart Corp., 129 N.H. 591, 617 (1987) (stating that "a reply brief may only be employed to reply to the opposing party's brief, and not to raise entirely new issues"). The defendants do indicate in their reply brief that they are responding to inaccurate statements that Vention made in its brief. However, the statements that the defendants point to come from Vention's recitation of the underlying facts and procedural history and not from any particular argument. Thus, while it is appropriate for the defendants to attempt to correct these inaccuracies, it is not appropriate for the defendants to raise the entirely new issue of whether certain admissions of trial witnesses were fatal to Vention's case.

VII

The defendants raise several challenges to the injunctions that the trial court issued. "It is within the trial court's sound discretion to grant an injunction after consideration of the facts and established principles of equity." Town of Atkinson v. Malborn Realty Trust, 164 N.H. 62, 66 (2012). "We will uphold the trial court's factual findings unless the evidence does not support them or they are erroneous as a matter of law." Id. "We will uphold the issuance of an injunction absent an error of law, an unsustainable exercise of discretion, or clearly erroneous findings of fact." Id. (quotation omitted).[2]

---

[2] The defendants argue that we should review the trial court's injunctions de novo. They provide

15

The UTSA provides that courts may enjoin "[a]ctual or threatened misappropriation" of trade secrets. RSA 350-B:2, I. Furthermore, a party enjoined from misappropriating a trade secret may petition the court to terminate the injunction if the trade secret has ceased to exist. Id. "Usually the duration of an injunction is designed to preclude defendant's wrongful activities for a period of time reasonably necessary to protect plaintiff's interests; the period of time that would be required for independent development is the most commonly employed standard." 4 Roger M. Milgrim & Eric E. Bensen, Milgrim on Trade Secrets § 15.02[1][d], at 15-248 to 15-248.1 (2017).

The defendants argue that the trial court erred in its grant of injunctive relief because the injunctions: (1) are not supported by specific factual findings; (2) improperly expand upon Pappas's employment covenants; and (3) are overbroad because they are not tailored to remedy the alleged harm.

Before we address the merits of the defendants' arguments, we turn to Vention's argument that the defendants did not preserve their challenges to the trial court's injunctions. Vention argues that the defendants "failed to file a motion to reconsider or otherwise bring these specific issues to the trial court's attention." The defendants argue that they preserved their challenges by objecting to the injunctions that Vention proposed in its post-trial brief. According to the defendants, the trial court adjudicated their objections when it "incorporated verbatim" five of Vention's proposed injunctions. (Italics omitted.)

Based upon our review of the record, we agree with the defendants that they preserved their arguments that the injunctions improperly expand upon Pappas's employment covenants and are overbroad because they are not tailored to remedy the alleged harm. The defendants, in their post-trial brief, argued that "Vention . . . is not entitled to any relief, let alone to the outrageous demands in its Post-Trial Memorandum and Proposed Order, by which it seeks to expand greatly the unreasonable and unenforceable restrictions in the Agreement Mr. Pappas was forced to sign in 2004." The defendants also argued that "the relief requested by Vention is oppressive and punitive; the broadly worded language proposed by Vention would place [Pappas] at risk for the rest of his life without prior notice of what, exactly, is prohibited."

---

only one supporting cite, with no explanation: MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 516 (9th Cir. 1993). Although the Ninth Circuit in that case noted that it reviewed "questions of law underlying the issuance of a preliminary injunction" de novo, it nevertheless reviewed the grant of a preliminary injunction for an abuse of discretion. See MAI Systems Corp., 991 F.2d at 516. Accordingly, we are not persuaded that we should diverge from New Hampshire precedent, and we will uphold the trial court's injunctions "absent an error of law, an unsustainable exercise of discretion, or clearly erroneous findings of fact." Town of Atkinson, 164 N.H. at 66.

16

However, these arguments from the defendants' post-trial brief are not sufficient to preserve their argument that the trial court erred by granting injunctions that were not supported by specific factual findings. At the time that the defendants objected to Vention's proposed injunctions, the trial court had neither made any factual findings nor granted any permanent injunctive relief. The alleged error — a lack of specific factual findings supporting the injunctions — could not have occurred until after the trial court issued its order. Consequently, the trial court never had an opportunity to address this alleged error in the first instance. If the defendants had brought this alleged error to the trial court's attention through a motion to reconsider, the trial court could have stated why its factual findings were sufficient or, if it believed that its findings were insufficient, corrected its error by modifying the injunctions or issuing additional findings of fact. Accordingly, this argument is not preserved for our review. See Butland, 147 N.H. at 679.

The first injunction that the defendants challenge provides: "1. The Defendants are hereby permanently enjoined and restrained from directly or indirectly disclosing or utilizing in any way any confidential or proprietary information, trade secrets, designs, inventions, intellectual property, and moral rights or processes of [Vention]." The defendants argue that this injunction is "unnecessary and unfair" because it turns a contractual clause into a permanent injunction. According to the defendants, "[i]f Vention believes in the future that [the defendants are] violating a confidentiality obligation, it no doubt will find [them] and sue [them]."

One of Vention's claims was for breach of contract. The trial court found that the confidentiality agreement was enforceable to the extent that it barred Pappas from disclosing or using Vention's proprietary information. The trial court ruled that the defendants misappropriated Vention's trade secret information. Based on this record, the trial court sustainably exercised its discretion in deciding to enjoin the defendants from further violating the confidentiality agreement.

The defendants raise the same challenges to the second and third injunctions, which prohibit the defendants from "directly or indirectly designing, manufacturing, producing, selling, or consulting" on HST with specified characteristics, perpetually for HST made of polyester, and for ten years for HST made from other materials. The defendants argue that it was reversible error for the trial court to issue these injunctions because the injunctions are not limited to the specific process or products at issue in the case. We disagree.

The trial court stated in its order that it wanted to delineate prohibited conduct by providing a bright line. It then explained that the defendants were "enjoined from utilizing Vention's trade secrets to manufacture the specified products at issue in this case." Thus, looking at the trial court's order as a

17

whole, it is apparent that the primary purpose of the injunctions is to enjoin the defendants from using the specific information at issue in the case — Vention's trade secret technology for making HST. To the extent that the injunctions prohibit the defendants from working with HST using a different process, the trial court noted that "if [the defendants] are able to produce such products without the use of Vention's trade secrets, then they may petition to modify this injunction." In other words, the injunctions place the burden on the defendants to prove that they are using a process other than Vention's trade secret technology before they can work with HST. Without such a burden, if the defendants began to work with HST, Vention would have no way of knowing whether they were doing so with the use of Vention's trade secret technology. Vention would then be in a position where it would need to sue the defendants to determine whether they were violating the court's injunctions.

Therefore, although the injunctions prohibit conduct that falls outside the scope of Vention's trade secrets, they do so only for the limited purpose of placing the burden on the defendants to prove that they are not using Vention's trade secret technology for making HST. Considering that the trial court found that the defendants misappropriated Vention's trade secret technology for making HST, we cannot say the trial court committed an unsustainable exercise of discretion by placing this additional burden on the defendants, should they seek to work with HST by using another process. See RSA 350-B:2, III ("In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.").

The defendants next argue that the injunctions do not define Vention's trade secrets. We disagree. In prior sections of the trial court's order, the court describes Vention's technology and determines that this technology is trade secret. Thus, considering the trial court's order as a whole, it is clear that the trial court's subsequent references to "Vention's trade secrets" refer to its earlier determinations regarding what information constituted Vention's trade secrets.[3]

The defendants next argue that "there was no basis" for the durations of these injunctions. We disagree.

The trial court granted a perpetual injunction for HST made from polyester and a ten-year injunction for HST made from other materials. The trial court reasoned that the durations were appropriate because "Vention has

---

[3] With regard to the second injunction, the defendants additionally argue that there "is no rhyme or reason for this injunction" because "[i]t was undisputed that Pappas had not attempted to make [polyester HST]." For the reasons described above, we interpret the trial court's order as prohibiting the defendants from working with polyester HST using the trade secrets that they misappropriated. The injunction's broader prohibition on the use of other technology can be modified should the defendants choose to petition the court and demonstrate that they are using a process other than the process that the trial court found them to have misappropriated.

proved that its product cannot be reverse engineered"; "Vention has proved that its process has not been duplicated by any competitor"; and Vention's expert Rauwendaal "expressed doubt that a company undertaking to develop this technology would be successful, but opined that if successful, the project would take at least four to five years and involve many people and many resources." Based upon these findings, we cannot say that the trial court erred in determining the duration of the injunctions. See Curtiss-Wright Corp. v. Edel-Brown Tool & Die, 407 N.E.2d 319, 326 (Mass. 1980) (ruling that trial judge did not abuse his discretion in issuing a permanent injunction where he determined that neither the defendant nor "others in the trade" were "likely through legitimate procedures to learn the [trade secret]"). Furthermore, we note that if Vention's trade secrets cease to exist, the defendants can petition the court to terminate the injunction. See RSA 350-B:2, I.

The fourth injunction that the defendants challenge provides, in relevant part: "4. The Defendants are hereby permanently enjoined from directly or indirectly designing, manufacturing, producing, selling, or consulting on [the part that Tayebi testified was trade secret] or . . . [a] substantially similar [part]." The defendants argue that this injunction is improper because "by referring to 'substantially similar' [parts] it seems to prevent [the defendants] even from using [parts] which can be purchased on the open market." We disagree. By its plain terms, the injunction prohibits "designing, manufacturing, producing, selling, or consulting" on a substantially similar part, but does not prohibit purchasing or using a substantially similar part. Thus, the injunction would not prohibit the defendants from purchasing or using commercially available equipment.

The fifth injunction that the defendants challenge provides, in relevant part: "5. The Defendants are ordered to destroy all their equipment, designs, and testing within 30 days of this Court's order and provide certification of such destruction." The defendants argue that the injunction orders them to destroy "all [their] equipment" "without explaining what equipment was included and without delineating between the only component that had been found to have been misappropriated . . . and any other components." (Quotations omitted.) The defendants further request that the destruction be "limited solely to the specific item found to have been misappropriated, and not to the rest of the [defendants'] [m]achine or to any other equipment."

We find no ambiguity in the trial court's injunction. The trial court ordered the defendants to destroy "all" of their equipment. There was no need for the trial court to delineate between the part that Tayebi testified was trade secret and the other components because they were all encompassed by the injunction.

Additionally, we decline the defendants' invitation to limit the destruction solely to the part that Tayebi testified was trade secret. The trial court made

19

several findings that support its injunction ordering the destruction of the defendants' entire machine. For example, the trial court stated that "[a]lthough Pappas claims to have developed Ascend's technology independently of Vention, there is very little documentation of experimentation that would explain how he came to design his machine[] and select the parameters on which [it] ran and select the materials he used," and credited the conclusions of Rauwendaal and Tayebi that the defendants "copied Vention's technology." Thus, even though the defendants' machine was not identical to Vention's machine, by virtue of its design, it employed Vention's trade secrets for producing HST. Therefore, it was an appropriate exercise of discretion for the trial court to order the destruction of the defendants' machine. See Town of Atkinson, 164 N.H. at 66 ("We will uphold the issuance of an injunction absent an error of law, an unsustainable exercise of discretion, or clearly erroneous findings of fact." (quotation omitted)).

VIII

Vention cross-appeals the trial court's ruling that it was not entitled to attorney's fees. Vention argues that it is entitled to attorney's fees either pursuant to RSA 350-B:4, III because the defendants willfully and maliciously misappropriated Vention's trade secrets; pursuant to RSA 350-B:4, I, because they filed a counterclaim for trade secret misappropriation in bad faith; or under the common law because they committed numerous bad faith litigation actions.

"The general rule in New Hampshire is that parties pay their own attorney's fees." Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 29 (2017). However, "[a] court may award attorney's fees when specifically authorized by statute." Id. Here, RSA 350-B:4 provides such an exception. That statute provides, in relevant part, that the trial court "may award reasonable attorneys' fees to the prevailing party when: I. A claim of misappropriation is made in bad faith . . . or III. Willful and malicious misappropriation exists." RSA 350-B:4 (emphasis added). Another exception to the general rule is the bad faith litigation theory. See Fat Bullies Farm, 170 N.H. at 30.

> Under the bad faith litigation theory, an award of attorney's fees is appropriate when one party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, when the litigant's conduct can be characterized as unreasonably obdurate or obstinate, and when it should have been unnecessary for the successful party to have brought the action.

Id. (quotation and brackets omitted).

"We will not overturn the trial court's decision concerning attorney's fees absent an unsustainable exercise of discretion." Id. (quotation omitted). "To

warrant reversal, the discretion must have been exercised for reasons clearly untenable or to an extent clearly unreasonable to the prejudice of the objecting party." Id. (quotation omitted). "In evaluating the trial court's ruling on this issue, we acknowledge the tremendous deference given a trial court's decision regarding attorney's fees." Id. (quotation omitted). "If there is some support in the record for the trial court's determination, we will uphold it." Id. (quotation omitted).

Here, the trial court acknowledged that the defendants "engaged in intentional misappropriation of Vention's intellectual property." The trial court noted, however, that Pappas "acted reasonably in consulting with counsel before proceeding" and that "she advised him that he was able to proceed [with] producing [certain HST products]." The trial court further noted that "Vention appear[ed] to have suffered no significant financial harm from the misappropriation." Although the trial court concluded that the "case is a close one," it ultimately declined to award attorney's fees against the defendants.

Vention first argues that the trial court should have awarded fees under RSA 350-B:4, III because the defendants "willfully misappropriated [its] trade secrets." Vention argues that the trial court correctly found that the defendants "engaged in intentional misappropriation of Vention's intellectual property," but, in declining to award fees, improperly relied upon the facts that Pappas met with an attorney and that she advised him that he was able to proceed with making HST. Vention argues that this "limited advice" "does not apply to the circumstances of defendants' misappropriation and should not have been used to militate against an award of fees to Vention." In particular, Vention argues that "there is no evidence to support that Mr. Pappas' use of Vention's technology . . . in his competing venture was ever within the scope of [the attorney's] representation of Mr. Pappas."

The trial court, however, acknowledged weaknesses in the advice the attorney gave to Pappas: "whether due to [Pappas's] insufficient disclosure to [the attorney] or due to her misunderstanding of the technology, she advised him that he was able to proceed [with] producing [certain HST products]." Thus, it does not appear that the trial court misunderstood the circumstances relating to Pappas's receipt of that advice, and we cannot say, based upon this record, that it was an unsustainable exercise of discretion for the trial court to give some weight to this fact.

Vention additionally argues that the "trial court's reliance upon the apparent lack of financial harm as a factor militating against an award of attorneys' fees also is misplaced." Vention argues that it "spent both significant time and incurred substantial costs in order to protect its intellectual property."

21

Notwithstanding Vention's litigation expenses, the trial court is correct that Vention's prompt action likely prevented the defendants from causing Vention to lose sales or customers. In other words, the defendants' misappropriation did not cause "significant financial harm" to Vention's business in the medical HST field. Given the wide discretion and deference that the trial court has in determining whether to award attorney's fees, we cannot say that it was unreasonable for the trial court to consider the fact that Vention did not suffer "significant financial harm" to its business beyond the cost of litigating its claims.

Therefore, we affirm the trial court's decision not to award Vention attorney's fees under RSA 350-B:4, III because it was supported by a finding that Vention suffered "no significant financial harm" and by the fact that Pappas at least attempted to obtain legal advice prior to forming Ascend and building his machine.

Vention next argues that the trial court should have alternatively awarded it attorney's fees pursuant to RSA 350-B:4, I. See RSA 350-B:4, I (permitting a court to award reasonable attorney's fees to the prevailing party when "[a] claim of misappropriation is made in bad faith"). According to Vention, the defendants asserted their counterclaim for misappropriation in bad faith because, late in the proceedings, they argued that Vention had brought its lawsuit in order to steal their technology. According to Vention, the trial court recognized in its order that "[u]ltimately, defendants implicitly conceded that there were, in fact, no trade secrets." Vention argues that "[g]iven the absence of any information even purporting to support the alleged trade secret claim, it is apparent that defendants asserted this claim even though they understood the claim had no merit and ultimately did not move forward with it at trial."

We disagree with Vention's contention that the defendants produced no evidence to support their counterclaim. For example, the defendants produced evidence of Vention's "Project 250," which was an attempt by Vention to commercialize products similar to those produced by the defendants. Although the trial court ultimately believed Vention's evidence that it "ha[d] long been aware of the materials, process, equipment, and technology necessary to produce" those products and that it decided not to go forward with the project for another reason, that does not mean that there was "an absence of any information even purporting to support" the defendants' claim. Therefore, we cannot say, based upon our review of the record, that the trial court unsustainably exercised its discretion by deciding not to grant attorney's fees on this ground.

Vention next argues that it is entitled to attorney's fees because the defendants engaged in bad faith litigation. Vention relies upon the defendants' "bad faith misappropriation of Vention's trade secrets"; their "bad faith

22

assertion of a trade secret counterclaim"; their "unreasonable method of conducting a search for documents" during discovery; their "failure to preserve obviously relevant information, including technical specifications for defendants' HST products"; and testimony indicating that the defendants may not have produced an additional lab notebook. According to Vention, this evidence "demonstrates by a preponderance of the evidence that defendants engaged in bad faith actions, actions which not only unnecessarily prolonged the litigation, but [were] patently unreasonable, and thus sufficient to support an award of attorneys' fees." But see Fat Bullies Farm, 170 N.H. at 30 ("If there is some support in the record for the trial court's determination, we will uphold it." (quotation omitted)).

As discussed above, the trial court determined that the defendants neither willfully and maliciously misappropriated Vention's trade secrets nor made a bad-faith claim of misappropriation, and there was support in the record for these determinations. With regard to the purported discovery issues, we note that the trial court is given "tremendous deference" in determining whether a party's actions warrant an award of attorney's fees. See id. (quotation omitted). Based upon our review of Vention's arguments and the record, we cannot say that it was "clearly untenable" or "clearly unreasonable" for the trial court to decline to award fees for bad faith litigation. See id. (quotations omitted). Accordingly, we affirm its decision not to award attorney's fees.

Finally, all issues raised in the defendants' notice of appeal that they have not briefed are deemed waived. See Lake Forest R.V. Resort v. Town of Wakefield, 169 N.H. 288, 293 (2016).

Affirmed.

HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred; DALIANIS, C.J., retired, specially assigned under RSA 490:3, concurred.